Good morning. I'm Lillian Wyshack for the Wadsworths and Gold Coast Medical Services. Take your time. Make yourself comfortable up there. I'm trying to... Okay. So I have ten minutes altogether. You have ten minutes altogether. Okay. So I have to... We have read the briefs. We understand the case. Yes. I'm hoping you read my briefs. And then also in Volume 3 of the record, exercise of record, I included the entire transcripts of the hearings. One was Judge Vasquez and one, well, a short one, a calendar hearing, and a trial was Judge Krupa. So that's all in there. And also some, a couple of briefs in support of my motions to dismiss in the tax quarter in there. And I put as many things as possible, and they're only separated by blue papers. That's the way they said to do it, and they have no tabs. But they're there, and they're listed in the front backwards as we were told to do. So I hope that you'll look at those as well as the other things. And my last brief is better than my first brief, but they both have things that I hope you'll consider. There are three cases. Well, let's see. Right now, I want to emphasize that these taxpayers, this is not a case that involves any kind of a tax scheme to evade or avoid taxes. It's not a tax shelter case. These people, the Gold Coast Medical Services was a partnership, a business partnership, that supplied medical products mainly to the state of California. They filed their returns. They reported the entire income. And one day they got a letter from the state saying we want a refund of over $2 million, you know, just like that, and it's got to be made within 60 days or we're going to start withholding from your subsequent sales. So they began investigating whether to file amended returns based on this threat that was so immediate. And they went to a tax attorney, didn't they? Yes, they did. And he told them that they couldn't take a current deduction for a reduction? No, no. No? That's what happened. What happened was they asked their own regular preparer who was just doing routine tax returns for them year by year, and he said, I don't feel comfortable doing this. But he did not give them any advice. The phrase, I do not feel comfortable, interestingly enough, was used in an article in the American Bar Association in a ‑‑ it wasn't a blog, it was something on the Internet which I cited in my brief. And it says ‑‑ it was about associating experts when you're in doubt, and it starts out, suppose you're a divorce attorney and you don't feel comfortable dealing with a tax question in the divorce case, and then it's all about working with other attorneys. And exactly that is what happened. They did not take ‑‑ they did not reject advice. This is very important because Judge Crawford kept saying that they rejected the advice of their long‑term attorney, of their long‑term CPA, and that was not true, and it should be ignored if it is stricken. Secondly, the person that gave the advice was a ‑‑ it was described by Mr. Huff, who was the accountant who prepared the second ‑‑ the amended returns. He was described in the testimony as a bankruptcy tax attorney. Now, to me, that's the highest kind of tax attorney. A bankruptcy tax attorney has to be sharp enough to know the entire Title 26 and the Bankruptcy Code and the interaction of the two. Someone that can handle that is capable of doing research on our one issue, I mean, well, the basic issue case about how to handle this letter from the state. And again, she just sort of brushes that off. And I have a couple of ‑‑ the other points on that is that they had revealed, I mean, they had given some details about this by some remarks. They showed the amount that was being asked by the state. There's one line that says the gross sales, whatever it is, the gross receipts, then the next line says returns and allowances. They put it under that. At other points in the ‑‑ and these are on ‑‑ that's on the 1065 partnership returns. At another point in those returns, they put some short descriptions. And I would like to particularly point to three things. Well, two of them are cases I'm sorry I found so late, but I'd like to have you consider these cases. One is the case of Recovery Group v. Commissioner, TC memo 2010-76. In this, there was a CPA who was involved with a buyout agreement from the beginning and had access to correct information, which was the case. Why don't you just give us the citations and we'll read the cases. I did. Okay. I did. Well, I will again. TC memo 2010-76 is Recovery Group v. Commissioner, filed April 15th, 2010. Okay. And then there's another case that I don't know why I didn't know about it, but it's on adequate disclosure. All right. Just give us ‑‑ you're going to use up your time. I'm sorry. So give us the citation of the second case. I will. I will. Okay. I have to say that this is on page 41 of the Recovery Group page, starting. It's a very long case. And the other case is called DIBSY, D-I-B-S-Y, and that is 1995-477. And that starts on ‑‑ I mean, on page 14 of the case approximately about adequate disclosure and other things that were sort of parallel to this case. And as long as I'm citing cases, I would like to cite Judge Fischer's concurrent opinion in Zillinks. Zillinks. Zillinks. I'm familiar with the case. And that is ‑‑ We have the citation for that. We have that. Okay. And in that case, this is not on this thing. This is on statutory construction about my contentions on TEFRA and the irrationality of it and how it should be handled. And in that connection, I have to ask, I'm sorry, I don't really do trial work. And I don't do ‑‑ and this is my first appearance here. And what happened at the end of Judge Trappe's case is I tried to ‑‑ I tried to be able to ask the accountant one question. The accountant, the first accountant, had been a witness for the government. And I didn't know this, but I figured, you know, he's going to be there. I'm going to ask him this question. And I asked him, and there was an objection. And it was ‑‑ anyway, it became an offer of proof. And I'd like that offer of proof. How do I turn that into evidence? I'd like to move it into evidence here. I don't know if I can do that. No, you can't. Can I tell you what the offer of proof was about? Was it in the record? It's in the record. It's at the end of ‑‑ well, it's at the end of the Crawford case, and it's in my briefs. Okay. Well, if it's in your briefs, then ‑‑ It's pretty much short. No, that's okay. We know what ‑‑ we have your briefs, so we'll ‑‑ Okay. Can I tell you where it is? That would be a helpful one. It's about ‑‑ I mean, it's about line ‑‑ page 2, line 4 of the 1065 returns in which no was checked automatically by the ‑‑ Oh, I think we're familiar with that. Not by any person's selection. Right. Yes. Okay. I remember seeing that in your briefs. And so, since I have such a short time, I wonder if I can just ‑‑ You're over time now. I'm already over time. We have your briefs. Okay. Well, anyway, at the beginning, my statement of issues, I tried to make it very clear. So that covers a lot of things. And I also want to say there's not an iota of evidence in the record that the Wadsworths ever received a refund. Okay. Thank you, ma'am. Okay. Gee, that was short. It is. But we rely on the briefs. Okay. The briefs are usually the most important part of the case. Thank you. And the record. Thank you. Okay. Thank you. Counsel. Good morning. May it please the Court. Counsel. My name is Andy Weiner. I represent the Commissioner of Internal Revenue in this matter. Perhaps some factual background would be useful. Taxpayer Larry Wadsworth was a 50 percent partner in ‑‑ We're familiar with the case. Thank you, Your Honor. I think the salient points here are that the Commissioner of Internal Revenue issued a notice of deficiency to taxpayer claiming that their tax deductions on their amended returns were improper, as well claiming an accuracy‑related penalty. Taxpayers then conceded the additions to tax at trial. And so the only issue at trial and on appeal are the accuracy‑related penalties. Those penalties are provided under Section 6662A. They provide a 20 percent penalty for underpayments of tax that are attributable to, among other reasons, substantial understatements. Understatements, a substantial understatement is defined as the greater of $5,000 or 10 percent of what the accurate tax liability for the taxpayer would be. Here, taxpayer conceded a liability of $141,000 for 2001. They conceded a liability of, I believe, $57,000 for 2002. And their total tax liabilities for those respective years would be $171,000 and $95,000. So clearly we are in excess of the 10 percent threshold that triggers the automatic 20 percent liability. Did the ‑‑just for my clarity, California sent them this notice that they were going to be owed some $2 million, but apparently California had overcompensated them? Was that the gist from the California? I believe, Your Honor, that the California Department of Health Services claimed that they had made $2.3 million in overpayments. In overpayments. Yes. To Gold Coast. Correct. And did California end up deciding that they didn't owe anything on that, or was it just a lesser amount? No. They decided that there's overpayments, that this claim for overpayments was, in fact, incorrect. And I believe that in the record, I think it's Exhibit 15J, is the administrative opinion that says that those overpayments were improperly claimed. So in the end they didn't owe California anything. Correct. So it was a false alarm. Yes. It was a false alarm. And in addition, taxpayers claimed that their Gold Coast Medical claims or listed their accounting as their modified cash. It's unclear what modified means. But a cash‑basis accounting dictates that they can't take a deduction unless they actually pay it. Now, even to assume that they were accrual‑based accounting, Section 461 says that if you want to deduct a contested liability, which this query is a case of that, then you have to make the payment. You either have to pay that money into escrow, or you have to pay that money to the person claiming it and then, obviously, claim it back. But neither of those things were done here, at least the record does not suggest. So the ‑‑ in addition to the fact that the taxpayers conceded the deficiency, you have the accuracy‑related penalty, I believe, as non‑dispute. As to the arguments that taxpayers assert that they are nonetheless not responsible for that penalty because of numerous reasons, I think the one that opposing counsel mentioned is that they had a reasonable basis and good faith for alleging a deduction, or for claiming a deduction, rather, Your Honor. That, under 6664, is a determination made on a case‑by‑case basis. It is reviewed by this Court for clear error. And in addition to the fact that the Treasury regulations clearly state that the most important, the salient fact, the salient determination that needs to be made is taxpayers' effort to determine their accurate tax liability. So what did they do? They took a reduction in gross income, didn't they? They took a reduction in gross income, yes. Okay, so they essentially said, we've been told we're going to make $2 million less than we had previously reported because California is going to make us pay back, forego $2 million, and what they wanted to do was then adjust their gross income for the two years that were involved? They wanted to take a deduction, effectively, for a debt that they had not claimed on their original return. So it wouldn't be gross income that they wanted to reduce. It was actually the net. Net? Yes, because it was a deduction. It wasn't they wanted to ratchet down their gross income. They wanted to take a deduction that would offset their gross income and so their net income would be less. And what they did is they approached their long‑time CPA to actually take this deduction, and the CPA said that he wouldn't do it. He was not a lawyer. I guess I misspoke. He was just a CPA. He was a CPA, Your Honor. He was a partner. That's gorgeous. Yes, that would be gorgeous. And he said that he would not ‑‑ he didn't feel comfortable taking the deduction unless taxpayers' counsel in the administrative matter, who is Mr. Rosenstein, who is a lawyer, a bankruptcy lawyer that opposing counsel referred to, unless Mr. Rosenstein could come forward with some support for the deduction. And the CPA's request was ignored. Instead, Mr. Rosenstein went out and handpicked a person that he had worked with who was a tax preparer and who was the only person who testified on taxpayer day after trial. And he had a significant background in finance, granted, but he doesn't claim to be a CPA. He doesn't have any expertise in tax matters that are on the record. And in addition to the fact that Mr. Huff, who is this person's tax preparer's name, claims that he did nothing but rely on Mr. Rosenstein's assurances that the deduction would be appropriate. And given that taxpayers' longtime CPA raised a significant red flag saying that he was uncomfortable unless there was some support, and instead of actually pursuing what the actual support for the deduction would be, taxpayers, well, they didn't testify at trial, what is in the record that we can tell is that that plea for support was ignored. There's no evidence as to what the particular advice was that Mr. Rosenstein was giving taxpayers. And Mr. Rosenstein went out and found his preparer that he used in other matters who wouldn't question him. And we submit that that's not a reasonable cause of good faith. And clearly it's not clearly erroneous for the tax court to have done that. The argument that's being made, as I understand it, is that the taxpayers went to their CPA. He said, I don't feel comfortable. I don't have enough information. I've done some research. As you say, he wanted the legal counsel to advise. The legal counsel instead went to Huff. But that in and of itself doesn't seem out of line. If the regular CPA has said, I don't feel qualified to decide this, I'll rely on Mr. Rosenstein. Rosenstein then, as a lawyer, makes a judgment and goes to another tax preparer or CPA to file the return. Counsel's argue, well, you know, when you're in doubt, the ABA says go hire an expert. So they had the expert. It was Mr. Rosenstein. Is that correct? I would say that is not correct, Your Honor. There's no evidence that Mr. Rosenstein was a qualified tax expert. Mr. Huff testified that he was a tax preparer when he was 16 and worked in his father's business. But there's no evidence as to what Mr. Rosenstein's expertise was in the practice. I mean, merely hiring an attorney, Your Honor, is the regulations in this Court's precedent clearly states merely hiring an attorney is not sufficient to establish reasonable basis. Now, in this case, we have no idea what Mr. Rosenstein's advice was to taxpayers. And we have no idea why taxpayers went with Mr. Rosenstein as to their long-time preparer. Well, their preparer said he was just a CPA, so he didn't know the law, so. I don't think that he said he didn't know the law. He said that he had done some research and he did not find any basis for taking the deduction and he wouldn't feel comfortable unless a basis was provided, and none was. And in addition to that, again, it is taxpayers' burden to establish that they've met the reasonable basis requirement. So all these omissions from the record ultimately fall against taxpayers establishing that they had a reasonable basis. With my remaining 30 seconds or so, I just hope to address. Fifteen. Okay. And dropping. Well, then in three sentences, there are two arguments the Taxpayers' Council raises for the first time in their reply brief. And I'm aware of the reply brief issue. Okay. Thank you very much, Your Honor. I appreciate that. Thank you. The case argued is submitted. I'll give you one minute, but you didn't reserve time. Wait a minute. Wait a minute. You'll have to come up to the microphone. We'll give you the time to do that. Okay. Don't rush. I was not conceding the tax. I was trying. I guess I was just talking too much. I had offered a couple of times to make a settlement where the tax they would pay the tax and the penalties would be eliminated. They refused the settlement. That was a long time ago, and a lot of work has gone on since then. And at that point, I was not conceding. I was trying to settle it again orally, but, of course, that was not the right thing, I was told. So I have this case here in re-reigns, which has to do with ‑‑ Just give us citations. You've got it. Okay. So it's number three in my reply brief. But, again, about this accountant. Let's not go into that. We have the record. We know what the arguments are. May I just direct something? He said that Mr. Rosenstein was a bankruptcy attorney. Bankruptcy tax attorney is what was testified to by Mr. Huff. And he ‑‑ there is nothing in the record contrary to that. Fine. We have that. We're aware of that. We have the record. Great. We know your argument. Thank you. Okay. Thank you very much. Case argued as submitted. Can I just say one little thing? The red flag was followed and by that he got Rosenstein. Yes. Thank you. All right.
judges: Strom, Fisher, Bybee